UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
E.P. and E.D., on behalf of their son E.P.                    :    14-CV-6032 (ARR)
                                                              :
                           Plaintiff,                         :    NOT FOR ELECTRONIC
                                                              :    OR PRINT PUBLICATION
       -against-                                              :
                                                              :    OPINION & ORDER
THE NEW YORK CITY DEPARTMENT OF                               :
EDUCATION,                                                    :
                                                              :
                           Defendant.                         :
                                                              :
------------------------------------------------------------- :
                                                              :
                                                              X

ROSS, United States District Judge:

Plaintiffs E.P. and E.D. bring this action against the New York City Department of Education ("DOE") on behalf of their son, E.P. (collectively with parents, "plaintiffs"), an autistic student who suffers from significant delays in the development of his cognitive, linguistic, interpersonal, and motor skills. Plaintiffs contend that the DOE failed to offer E.P. a "free and appropriate public education" for the 2011–2012 school year as required under the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. § 1400 et seq. Plaintiffs rejected public schooling, enrolled E.P. in a private school for 2011-2012, sought tuition reimbursement, but were twice denied, and now move for summary judgment in this case, seeking reversal of the administrative decisions that denied reimbursement. The DOE cross-moves for summary judgment, contending that the administrative decision should be affirmed. For the reasons set forth below, Plaintiffs' motion for summary judgment is denied in its entirety and the DOE's cross-motion is granted.

## Statutory Background

The IDEA grants students with disabilities the right to a "free appropriate public education ... designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A-B). Using the carrot of federal funding, the act requires states to create an "individualized education program" ("IEP") for each disabled student every school year. The IEP is a written plan that details a student's current capabilities and deficiencies, sets annual goals and short-term benchmarks, and prescribes specific educational services for the upcoming school year. D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507–08 (2d Cir. 2006). After the IEP is created, the student is assigned to a local public school.

In New York, the yearly IEP is created by a local "committee on special education" ("CSE") composed of the student's parents, a special education teacher, a school psychologist, a representative of the school district, a local parent, and other uniquely informed individuals such as the student's current or former teachers. See N.Y. Educ. Law § 4402(b)(1).

After the CSE drafts the student's IEP, his or her parents may challenge whether the IEP actually provides a free appropriate public education by requesting an administrative hearing before an "impartial hearing officer" ("IHO"). At the hearing, parents may be represented by counsel an call and cross-examine witnesses, including educational experts. The IHO's decision may be appealed to a "state review officer" ("SRO"), and that decision may, in turn, be appealed to the district court. See 20 U.S.C § 1415(i)(1)(B); 20 U.S.C. § 1415 (i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

While contesting the adequacy of the educational services proposed in the IEP, parents may enroll their child in private school and initiate a reimbursement action against the local

school district for tuition costs. 20 U.S.C. § 1412(a)(10)(C). Under the three-step Burlington / Carter test, parents are eligible for reimbursement if: 1) the IEP was inadequate to afford the child an appropriate public education, or had procedural infirmities, 2) the private program met the student's special education needs and 3) the equities favor reimbursement. See Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14 (1993).

If, on review, the IEP is found adequate – i.e., it was "reasonably calculated to confer an educational benefit" – there is no need for the IHO, the SRO or the reviewing court to consider the second and third steps. T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417-418 (2d Cir. 2009); M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.").

**Factual and Procedural Background**

1. E.P.'s educational history

E.P., who was born in January 2004, was diagnosed with pervasive developmental disorder and continues to suffer from deficiencies in his speech, attention, motor skills, and other functions. IHO Hearing Transcript at 391-392. The IEP under review here was created in March 2011. In July 2010, nine months before the IEP drafting, E.P.'s "cognitive abilities, academic achievement, [and] social and behavioral functionings" were described in a report as "below age expectancy." Psycho-Educational Assessment Report, attached as Ex. H to IHO record, at 9. `

The report states that E.P.'s attention span was short and he was "distracted easily from a task by anything near him, such as a pencil, an eraser or a clock." Id. at 3. E.P. was "short of verbal communication, and only one-syllable words pronounced repetitively could be spoken by him, such as cat, tree, or dog." Id.

For the 2010-2011 school year, E.P.'s parents enrolled him at the Rebecca School ("Rebecca"), a private for-profit school designed specifically for autistic students. A DOE observer visited E.P.'s class at Rebecca in October 2010 and reported that E.P. laid face down on a trampoline and was nonresponsive while his teacher explained a calendar and read from a storybook, but was later roused by a snack, which he ate quietly without interacting with the five other students at his table. DOE Classroom Observation, attached as Ex. S to IHO record, at 2. Afterwards, E.P. played with putty and was able to arrange toy numbers in the proper sequence, starting with one and ending with ten. Id. Throughout the observation, his teacher or one of the teacher's three assistants encouraged E.P. to pay attention and to comport with classroom norms, such as putting away toys after use.

A December 2010 progress report by E.P.'s teacher at Rebecca noted that he often mouthed small objects and would "become upset, run around the classroom in a continuous loop, or laugh hysterically" when "a limit [was] set, during transitions, or after engaging in an overly exciting physical interaction." Interdisciplinary Progress Report, attached as Ex. Q to IHO record, at 1. By this time, E.P. used "one to two word utterances," paired with gestures, in order to communicate, could sight-read about ten words, and could perform addition for numbers up to ten. Id. at 2-3. He was able "to navigate throughout the school building," independently use the bathroom, and "wash his hands with minimal prompts from staff," although his occupational therapist noted that he was clumsy and often bumped into objects and people. Id. at 5-6.

## 2. The CSE and the 2011-2012 IEP

On March 9, 2011, the CSE met to edit a draft IEP for E.P.'s 2011-2012 school year. Present in person or telephonically were E.P.'s father, a DOE special education teacher named

4

Feng Ye, a DOE school psychologist, a parent member, E.P.'s then-current teacher at Rebecca, and a social worker from Rebecca. Tr 33-34.[1] The CSE team reviewed the classroom observation and progress reports mentioned above. Tr. 35-38.

For the 2011-2012 IEP, the CSE agreed to change E.P.'s classification from Speech Impairment to Autism, and determined that E.P. needed consistent 12-month schooling rather than the typical 10-month school year. Tr. 38-39. Next, the group considered staffing ratios, decided that student / teacher / teacher assistant ratios of 12:1:1 and 8:1:1 were inappropriate given E.P.'s distractibility and frequent need for adult guidance, and recommended a 6:1:1 classroom, with E.P. to be assigned his own additional 1:1 full-time teacher assistant (also known as a crisis management paraprofessional). Tr. 40-43.

The IEP recommended that E.P. be given extra time for tasks, a visual schedule to ease difficulties with transitions, extra breaks, and use of sensory tools[2] throughout activities. 2011-2012 IEP, attached as Ex. **D** to IHO record, at 3. The IEP provided that E.P. should receive individual speech and language therapy, individual occupational therapy, and individual counseling, each for thirty minutes twice a week. Id. at 18. The IEP also provided group physical therapy twice a week, and group speech and occupational therapy, once a week each. Id. The IEP recommended a Behavior Intervention Plan for E.P. and noted that "[m]odifications to his seat/chair may be warranted to help him focus his attention." Id. at 4.

Finally, the IEP listed annual goals for E.P., such as "develop basic math concepts" and "improve his engagement and pragmatic language skills," coupled with specific short-term objectives such as "read numbers 1 to 20 with 80% accuracy" and "appropriately gain attention

---

[1] "Tr." refers to the transcript of the proceedings before the Individual Hearing Officer included in the IHO report.
[2] Sensory tools are objects such as weighted vests, chew toys, bristled wands, elastic wraps, and aerosol shaving cream, that can help regulate autistic students and others with similar disabilities by providing pleasurable and predictable tactile stimulus.

by stating the communicative partner's name when provided with an initial phonetic or gestural cue, in 8/10 opportunities." Id. at 7, 10. The specific school (known as a "placement site") was to be determined later.

3. Plaintiffs' response to the 2011-2012 IEP

On May 4, 2011, before learning E.P.'s specific public school placement, plaintiffs enrolled him at Rebecca for the 2011-2012 school year, beginning July 5, 2011. Enrollment Contract, attached as Ex. K to IHO record, at 1.

On June 15, 2011, the DOE issued a notice confirming the IEP and assigning E.P. to P.S. 226 at P.S. 208, a specialized school for students with severe developmental disabilities. Final Notice of Recommendation, attached as Ex. E to IHO record.

On June 24, 2011, in a letter to the DOE, plaintiffs rejected the IEP and school placement. E.P.'s father wrote that he and a teacher from Rebecca had visited the P.S. 226 school and found it unsatisfactory. According to plaintiffs, "there were lots of materials around the classroom," insufficient sensory supports, a "noisy and busy cafeteria," and not enough time for students to eat lunch. Parents' Letter to CSE, attached as Ex. F to IHO record. Plaintiffs informed DOE that they would continue to enroll E.P. at Rebecca.

A week later, on July 1, 2011, plaintiffs filed the required due process complaint, which reiterated prior concerns about the IEP. Due Process Complaint, Ex. A, at 3. Plaintiffs alleged that the P.S. 226 classrooms "contained lots of materials" that would be "highly distracting" and "overwhelming." Id. According to plaintiffs, there were "no sensory supports or equipment" in the classroom, the occupational and physical therapy areas "were insufficient to meet [E.P.'s]

6

needs" and were "not isolated," and there was not enough time allotted for E.P. to transition between lunch and classes. Id.

4. The IHO Decision

Having received the plaintiffs' due process complaint, the IHO convened hearings on January 3 and February 14, 2012. The IHO heard testimony from E.P.'s parents, Samantha Stabile (E.P.'s then-current teacher at Rebecca), Tina McCourt (program director at Rebecca), Feng Ye, (the special education teacher from the initial CSE), and Ana Rand, a special education teacher who likely would have taught E.P., had he attended P.S. 226. Tr., Index.

Ms. Rand provided details about P.S. 226 that were unavailable during the CSE's IEP-writing process, when E.P.'s school placement had not yet been determined. Ms. Rand testified that her class had two students at the beginning of the 2011-2012 school year, both of whom were diagnosed with autism and were learning at a kindergarten level. Tr. 126-127. Ms. Rand also testified that P.S. 226 was capable of executing the requirements in the IEP. To help E.P. with transitions, his teacher could develop a personal schedule, discuss changes in the schedule, and remind him of upcoming transitions. Tr. 134-136. To help E.P. with distractions, his teacher could remove charts and other posters from the walls and place E.P.'s desk so that he would not be distracted by classroom materials. Tr. 136-138. Finally, to help with E.P.'s potential problems with a noisy cafeteria located far from his classroom, his teacher could let him eat in the classroom with her and the paraprofessional. Tr. 151. Although her current students did not necessarily require sensory breaks, Ms. Rand provided breaks and her classroom had sensory tools the students could choose to use, with more tools available from the school's therapists. Tr. 129, 139-140.

7

E.P.'s father also testified at the hearing. He stated that his visit to P.S. 226 convinced him that the building was inadequate for his son, specifically, that the classroom wall materials would be too distracting, the therapy room would be occupied by too many people, and the lack of an elevator meant E.P. was at risk of falling on the stairs, possibly injuring himself and others. Tr. 366-370.

The IHO rendered a decision on April 18, 2012, finding that the IEP and P.S. 226 offered E.P. a free and appropriate public education, and thus denied reimbursement. The IHO report summarized the testimony of the witnesses and explained the applicable legal standards. See IHO Findings of Fact and Decision, at 2-7. The IHO found that the CSE had meaningfully integrated the concerns of E.P.'s parents and his Rebecca teacher and had tried to "mirror as closely as possible [E.P.'s] current class setting of 8:1:3" by placing him in a 6:1:1 class with his own 1:1 paraprofessional and by continuing occupational, physical, and speech therapy at the same rate and duration provided at Rebecca. Id. at 8.

The IHO noted that plaintiffs were particularly concerned with the specific site, P.S. 226, not with the IEP itself, but found that most of their complaints could have been addressed by adapting a classroom to meet E.P.'s needs, as Ms. Rand described in her testimony. Id. The IHO found that the DOE's set of sensory tools, while limited in comparison to the offerings of a private autism-specific school, was adequate, and plaintiffs could not show that E.P. needed each specific device available at Rebecca. Id. at 9. Finally, the IHO found no evidence "that the noise level in P.S. 226 was so severe that the student could not learn," and no evidence that the stairs would be an inappropriate safety risk. Id. at 8.

5. The SRO Decision

Plaintiffs appealed to the State Review Officer, who affirmed the IHO's determination that E.P. had been provided a free and appropriate public education. The SRO evaluated not only the plaintiffs' core concerns with the program and school offered to E.P., but also the legal arguments raised by counsel. Against plaintiffs' contention, the SRO found that the IHO had properly placed the burden of proof on the DOE. State Review Officer Decision, at 8. The SRO also found that the CSE had acted properly by not considering private placement after it determined it could craft a public school program to meet the student's educational needs. Id. at 9.

As to the merits of the IEP, the SRO found that a 6:1:1 class with a 1:1 paraprofessional would, in the language of the IDEA statute, "confer educational benefits upon the student," by aiding E.P. with transitions, attention, and self-regulation. Id. at 14.

Because the bulk of plaintiffs' complaints were directed not at the written IEP itself but instead at P.S. 226's supposed inability to implement the IEP, the SRO engaged in a lengthy analysis of Second Circuit caselaw to determine whether it would be appropriate to rule on this speculative, failure-to-implement argument. Id. at 14-16. The SRO concluded that when the student never attends the assigned public school, the law bars a counterfactual retrospective analysis of what problems might have arisen. Id. Accordingly, the SRO ruled that plaintiffs could only challenge the written elements of the IEP and could not prevail on any claims that P.S. 226 would not have properly implemented the IEP. Id. at 16.

In a belt-and-suspenders approach, the SRO then analyzed the failure-to-implement arguments he deemed inappropriate and found that, even if such arguments were permissible, E.P.'s IEP goals could have been met at P.S. 226. The SRO found no evidence showing that P.S.

226 "would have deviated from substantial or significant portions of the student's IEP in a material way." Id. at 17. The only concerns about P.S. 226's ability to educate E.P. stemmed from a school visit where E.P.'s father and his Rebecca teacher criticized the layout of the classroom and school building. Id. The SRO found evidence in Ms. Rand's testimony that the materials on the walls, the stairs, the noise level in the school, and other issues raised by plaintiffs could have been accommodated by the teacher and the 1:1 paraprofessional, by moving or removing materials in the classroom, accompanying the student down the stairs, and letting him eat in class if he had difficulty with the cafeteria. Id.

In conclusion, the SRO determined that the DOE had offered E.P. a free and appropriate public education, so there was no need to consider the second and third steps of the Burlington / Carter reimbursement test. Id. at 18.

**Standard of Review**

A district court reviewing administrative decisions in IDEA cases "'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" M.H. v. New York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir. 2012) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)).

Courts lack "the specialized knowledge and experience necessary to resolve ... questions of educational policy," so they must give "due weight" to the administrative proceedings. Gagliardo, 489 F.3d at 113 (internal quotation marks omitted). Courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the

hearing officer."[3] M.H., 685 F.3d at 241. "[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned." R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012). Deference is particularly appropriate when the state officer's review "has been thorough and careful," but the court does not "simply rubber stamp administrative decisions." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

## Discussion

The ultimate question for this court is whether, giving appropriate deference to state administrative officers, the DOE offered E.P. a free appropriate public education when it offered the accommodations and services listed in the 2011-2012 IEP. This is a two-part inquiry. First, courts examine "whether the state has complied with the procedures set forth in the IDEA." Cerra v. Pawling Cent. School Dist., 427 F.3d 186, 192 (2d Cir. 2005). Second, courts examine whether the IEP was substantively adequate, i.e., whether it was "reasonably calculated to enable the child to receive educational benefit[s]." R.E., 694 F.3d at 189-90. Plaintiffs have not contested the procedural adequacy of E.P.'s 2011-2012 IEP, instead challenging only its substantive adequacy.

When determining whether a student was offered a free appropriate public education under IDEA, "the IEP is the centerpiece of the system" and "must be evaluated prospectively as of the time it was created." R.E., 694 F.3d at 188. Thus, "speculative" arguments about implementation of the IEP are forbidden, and "it is error to find that a [free appropriate public education] was provided ... because of actions that [a] specific teacher would have taken <u>beyond what was listed in the IEP</u>." Id. at 187 (emphasis added).

---

[3] In this case, the IHO and SRO agreed

11

This rule constrains both sides. The school district cannot rehabilitate a facially deficient IEP by having a teacher testify "that certain services not listed in the IEP would actually have been provided" at the public school. Id. at 185, 187. At the same time, parents cannot challenge the IEP on the basis that "the school district will not adequately adhere to the IEP," even if they show that the student's assigned school has had past difficulties providing the services called for (such as occupational therapy). Id. at 195. That type of implementation challenge can only be brought "in a later proceeding to show that the child was denied a [free appropriate public education] because necessary services included in the IEP were not provided in practice." Id. at 187 n. 3.

Plaintiffs list multiple criticisms of the 2011-2012 IEP, but they neither claim that the package of services offered by DOE was inadequate, nor do they suggest any additional services that would have rendered the IEP satisfactory. Instead, plaintiffs question the ability of P.S. 226 to provide the listed services in a satisfactory manner. Although their criticisms are styled as objections to the written IEP, they are, in substance, objections to the brick-and-mortar school building and the ethos of the school's special education program. But, because these criticisms are based on a visit to the specific classroom that E.P. would have attended, they are not entirely "speculative" in the same sense as vague predictions of IEP implementation failure. Thus, the plaintiffs' objections to P.S. 226 should be individually evaluated on their merits instead of broadly dismissed as speculative. See B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d 343, 371 (E.D.N.Y. 2014) (evaluating "arguably non-speculative" objections based on prior school visit).

First, plaintiffs argue that E.P.'s potential classroom at P.S. 226 was inadequate because "there were materials on the walls," which could distract E.P., the program "required students to sit at desks, which E.P. could not do" because he lacked strength in his torso, and there were

"many items everywhere," "inedible objects all around that he could mouth." Pl. Mem. at 8-9. The IHO and the SRO reasonably concluded that these concerns could have been remedied by the teachers and staff at P.S. 226. The IEP did not require E.P. to sit at a desk, although it provided physical therapy for him to build his core muscles. Ms. Rand's testimony explained that teachers could have rearranged the classroom to meet E.P.'s unique needs. Removing posters, rotating desks, repositioning furniture and stowing loose objects are not complex, difficult, or expensive tasks, so there is no reason to believe the school would have failed to implement these accommodations. In relying on this testimony, the IHO and SRO did not violate the rule against curing a deficient IEP through retrospective testimony about additional, unwritten services – they merely used the testimony to demonstrate the P.S. 226's ability to provide the services already written into the IEP.

Second, plaintiffs argue that P.S. 226 lacked the sensory tools necessary to keep E.P. regulated and attentive. Plaintiffs accuse the IHO of erroneously concluding that "the class was equipped with sensory devices that the student could use," despite there being "no such testimony from [Ms. Rand]." Pl. Mem. at 12. In reality, Ms. Rand testified that she had sensory devices in her classroom and had additional devices available through the occupational therapist, including the weighted vests specifically called for in the IEP. Tr 129-130.

Furthermore, the record does not show that the DOE was unwilling or unable to obtain the equipment necessary to satisfy the IEP, had E.P. actually attended public school. "The mere fact that [the student's parent] did not observe 'various [specified] equipment' when he visited [the assigned public school] is insufficient to establish that the IEP would not have been properly implemented." B.K., 12 F. Supp. 3d at 372 (quoting N.K. v. N.Y.C. Dep't of Educ., 961 F.Supp. 2d 577, 592 (S.D.N.Y. 2013) ("The fact that Plaintiffs did not observe any sensory equipment on

their site visit is insufficient to demonstrate that [the proposed placement] lacked such equipment or that the school would not obtain the equipment necessary to implement [the student's] IEP should [he] attend the school.")).

Third, plaintiffs argue that it is inappropriate for E.P. to be in a crowded lunchroom or in a noisy environment, "[y]et those are core features in 6:1:1 programs." Pl. Mem. at 16. It is clear from the record that E.P.'s specific sensitivity to distractions and noise is an obstacle to his education, but it is equally clear that his teachers at P.S. 226 could have let him eat in the classroom to avoid the overstimulating cafeteria. The IEP does not require that E.P. eat in the cafeteria. As to the "noisy environment," the IHO and SRO concluded that any school or classroom populated by autistic students would have some degree of noise, which was confirmed by testimony that E.P. had made progress at Rebecca, even though his classroom there was also described as noisy. Tr. 204-205.

Fourth, plaintiffs argue that P.S. 226 was structurally inadequate for E.P. because his classroom would have been on the fourth floor, and he has trouble descending stairs. His father testified that E.P. needs to hold hands with an adult "when he goes down stairs." Tr. 369. The IEP addressed this concern by assigning a 1:1 paraprofessional who would have accompanied E.P. at all times, and the SRO recognized that this accommodation "mitigates the concern that stairs or other impediments in the assigned school would have posed a safety hazard." SRO at 17. Plaintiffs' briefs entirely ignore the IEP's provision of a 1:1 dedicated paraprofessional, and fail to explain why an ever-present adult was not sufficient to mitigate the risk of harm.

Finally, plaintiffs argue that the IEP was deficient because it failed to consider private placement as an alternative. This argument fails as a matter of law because a "free and appropriate public education" is an absolute standard, not a comparative or relative standard. The

14

public education offered is not diminished by the option of higher-quality private schooling, nor is the public education deemed sufficient because it surpasses the poor quality of local private schools. Once the CSE has determined that a public program is appropriate, there is no legal requirement to weigh it against private alternatives. M.C., 226 F.3d at 66 (holding that courts need not assess adequacy of private placement if IEP is determined to be adequate); Walczak, 142 F.3d at 123.

## CONCLUSION

The decisions of the Independent Hearing Officer and State Review Officer are affirmed, the defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

s/Allyne R. Ross

Allyne R. Ross
United States District Judge

Dated: August 13, 2015
Brooklyn, New York